GRUND *v.* FIRST NATIONAL BANK OF PETOSKEY.

1. APPEAL AND ERROR—EQUITY—DISPUTED FACTS — DUTY OF SU-
PREME COURT TO DETERMINE FACTS.

   While the Supreme Court, in considering a chancery case
   where the facts are in dispute, should, and does, give
   due weight to the findings of the trial judge, yet, hearing
   the case *de novo*, it is in duty bound to examine and
   determine the facts as well as the law.

2. TRUSTS—ACCOUNTING—EVIDENCE—BURDEN OF PROOF.

   In proceedings for an accounting by a trustee, where the
   trusteeship is admitted or established, it is the duty of
   the trustee to account for the trust funds received by him,
   and the burden of proof is upon him to establish the cor-
   rectness of the account.

3. SAME.

   But where the existence of such trust relation, claimed by
   plaintiff, is denied by the defendant, the burden is upon
   the plaintiff to establish such relation before the burden
   of accounting is cast upon defendant.

4. SAME.

   In proceedings for an accounting for a sum of money bor-
   rowed from, and placed in trust with, defendant with
   which to pay for certain timber lands purchased by plain-
   tiff, where it was plaintiff's claim that defendant should
   stand the loss occasioned by a defective title, because he
   failed to hold the entire sum and pay only on delivery
   of deeds conveying a good title and an abstract showing
   that fact, while defendant claims that plaintiff knew that
   the title was in different parties and that it was agreed
   that as fast as deeds were procured they were to be paid
   for, evidence examined, and *held*, to sustain the claim of
   defendant.

5. SAME.

   *Held*, that plaintiff cannot complain of the fact that de-
   fendant took title to the land in his own name, where the
   testimony clearly establishes that it was agreed he was
   to do so, and hold the same as security for the money
   he had advanced to pay for it.

**6. SAME.**

> The holding of the court below that defendant was liable for certain of the defects in the title, *held*, not supported by a preponderance of the evidence, and decree entered in this court dismissing the bill.

Appeal from Charlevoix; Mayne (Frederick W.), J. Submitted January 28, 1920. (Docket No. 96.) Decided April 10, 1920.

Bill by William Grund against the First National Bank of Petoskey and Chalmers Curtis for an accounting. From a decree for plaintiff, defendant Curtis appeals. Reversed, and bill dismissed.

*Mesick & Miller*, for plaintiff.

*B. H. Halstead*, for appellant.

FELLOWS, J. When this case was here on motion to dismiss the bill, we held that the bill set up a cause of action for equitable relief. *Grund v. First National Bank of Petoskey*, 194 Mich. 299. The case has since been heard upon its merits and is now here on appeal from a final decree. By this decree the bill was dismissed as to defendant bank and relief was granted against defendant Curtis. In considering a chancery case where the facts are in dispute, this court should, and does, give due weight to the findings of the trial judge. He sees the witnesses, notes their appearance on the stand, and his conclusions are always helpful to the court. But this court hears chancery cases *de novo*, and is in duty bound to examine and determine the facts as well as the law. If after fully considering the record and giving the findings of the trial judge due weight, we are satisfied that the controlling facts are otherwise than as found by him, it is as much our duty to reverse as though we conclude the

law of the case is otherwise than as found by him. Where a trustee is called upon in a court of equity to account for the funds received by him as trustee, and the trusteeship is admitted or established, the duty rests upon the trustee to so account, and the burden of proof is upon him to establish the correctness of the account; but where a plaintiff claims the trust relation exists, and this is denied by the defendant, or the plaintiff claims a certain contract was entered into which, if entered into, would establish a trust relation, and the defendant denies such contract was entered into but insists that another contract was entered into, one which did not create the trust relation, in such case the burden is upon the plaintiff to establish the trust relation, or the contract creating such trust relation, before he casts upon the defendant the burden of an accounting. In other words, plaintiff cannot by *claiming* that the trust relation exists cast the burden of proof upon the defendant. We make these statements preliminary to a consideration of the facts of the case in view of the discussion of the effect to be given the findings of the trial judge and the burden of proof, both of which subjects are treated at some length in the briefs.

The plaintiff was a lumberman operating at Walloon lake in Charlevoix county in 1908. He had in view the purchase of a piece of timber land. In conversation with Phil B. Wachtel, who was an insurance agent and real estate dealer, plaintiff learned that Wachtel knew the owners of the land. Plaintiff says, "He told me the French people. He mentioned Roy French as the owner." Plaintiff requested Wachtel to ascertain the lowest figure the land could be bought for. Later Wachtel informed him the land could be bought for $3,500. Plaintiff then owed the defendant bank three or four thousand dollars. He applied to the bank for a further loan of $3,500 with which to

make the purchase, but the loan was refused. He then asked the defendant Curtis, who was connected with the bank, to personally take the loan. As a result of some negotiations Curtis agreed to furnish the amount required. A note was executed to the bank for $3,750 with plaintiff's brother as an indorser. Plaintiff claims the extra $250 was a bonus; defendant Curtis that it was payment for his guaranty to the bank of plaintiff's indebtedness. As a matter of fact Curtis did execute to the bank an agreement guaranteeing the payment of plaintiff's indebtedness to the amount of $10,000. It should be stated that the question of usury is not here involved, the parties having had litigation heretofore in which that question was involved and which litigation was adjusted. Nor does plaintiff claim that the $250 was for any other services than those in procuring the loan. In the fall of 1910 Curtis made the final payment of $1,000 on the purchase price of this land. The crucial question in the case is, What was the agreement between plaintiff and Curtis with reference to the payment of the money? Plaintiff claims that it was to be paid only on delivery of deeds conveying a good title and an abstract showing that fact, while defendant claims that it was known to plaintiff that the title was owned by different parties and that it was agreed that as Wachtel procured these various titles payment should be made for them. We quote sufficient excerpts from the testimony of each of the parties to show their respective claims. The plaintiff testifies:

"Of course, the talk was that the land was being bought from the French people through Phil Wachtel, who was acting for me as representative to get their lowest price and after I had been advised of their lowest price by Mr. Wachtel, I made an arrangement with Mr. Curtis to get the $3,500. I borrowed $3,500 from Mr. Curtis and gave my note and John Grund's note for $3,750. I gave instructions at that time to

Chalmers Curtis and the First National Bank with reference to paying this $3,500 and to whom to pay it. I advised Phil Wachtel to have Roy French send his deed and abstract for this property to the First National Bank and that they would pay them over the money upon receipt of a good title. I also advised Mr. Curtis that this deed was to come from Roy French and on receipt of an abstract showing a good title to pay him .the money—to pay Roy French the money. I had been advised by Mr. Wachtel that Roy French was to send the deed. That was the arrangements I made with the First National Bank and Chalmers Curtis as its representative. Chalmers Curtis agreed to that. He accepted it and understood it that way, I presume. I never heard anything to the contrary. * * *

"In reference to turning over this money, the $3,-500, I told Mr. Curtis that I was getting this land and timber for $3,500, and the deed was coming from Roy A. French, and on receipt of a warranty deed with an abstract, showing a good title, he was to pay the money—$3,500. Mr. Curtis said that he would and that he would take care of it. I certainly expected that he would examine the abstract and pass upon the title for me. He said he would not pay the money out unless he got a good title and abstract; that was along in December. * * *

"In January, 1909, Mr. Curtis told me that he had gotten part of the title in and paid part of the money out. I don't think I am mistaken about that being January, 1909. We started right off the following month to lumber the piece and we put in about forty acres of the piece that winter. So I don't see how I could be mistaken on it."

Defendant Curtis testified as follows:

"That was Mr. Grund's instruction — when he (Wachtel) brought in the deeds and asked for the money, I was to pay him the money. The deeds were to come in installments. Before the deeds or any of them came, when I and Mr. Grund were talking about it first, his instructions to me were that probably the deeds would come in installments, and I was to pay over such money as he needed for that particular branch.

Without an abstract I could not tell what the interest of Mr. Grund was, whether one-third or one-fourth; I relied entirely upon him (Wachtel), as a competent man. I was simply to pay the money when I got the deeds. The title was not to be all cleared up at once. I wouldn't know that it was to be one deed or twenty —well—I did know that it was to be more than one. I knew that they were to come in installments. Mr. Grund informed me that Mr. Wachtel was looking after it for him; that he had made all his bargain with him. . * * *

"I didn't know anybody at all in this transaction besides Phil Wachtel and William Grund. I supposed that Mr. Wachtel was going to do the whole thing. He bought it, or Mr. Wachtel made all the arrangements. My information was that Mr. Wachtel was doing the whole business; he was to get the titles, he was to bring them to me; I was to advance him such sums as would cancel these particular deeds to those heirs, whoever they were. * * *

"I was to deliver the $3,500 as Mr. Wachtel brought in those deeds, as he could acquire them. I was to look them over and see that they were correct—as to execution—receive them, pay him out the money so he could settle with the heir. Nothing at all was said with reference to my examining the abstracts and passing upon the title, or having them examined. I am in the banking business. I am not a practicing lawyer. I have been admitted to the bar but I never practice except to foreclose a real estate mortgage by advertisement. I do not hold myself out to be a practicing or counseling lawyer. * * *

· "At this time when I made this payment, he (Wachtel) came and said that he had received the final deeds, that he had the final deeds. I said, 'Phil, is this the complete wind-up?' 'Yes,' he said. Then I said, 'You have all the deeds to complete the title?' He said, 'Yes,' and I gave him this check making full payment of $3,500."

Early in 1915 it developed that the grantor in one of the conveyances to Roy A. French, one Julius Earl French, was a minor when he executed the deed, and that one Molly French claimed a dower right. The

plaintiff adjusted their claim by paying $1,050. Defendant Curtis offered to pay $500 of this sum, but upon plaintiff's charging him with embezzling the fund he withdrew his offer and refused to pay anything under such charge.

Mr. Wachtel had died before the claims of Julius Earl French and Molly French were made known. Some of his acts in connection with this transaction are subject to severe censure, but as they have no bearing on the question before us, they will not be detailed. He had stood high both at Petoskey and in the State at large, and neither of the parties to this litigation knew of any facts showing that he was not entitled to their entire confidence. That Wachtel was employed by plaintiff in some capacity is admitted. The extent of his employment is in dispute. Plaintiff claims it was limited to ascertaining the price at which the land could be bought. This only involved an inquiry of the real estate agent who had the land for sale or a letter to French at Pittsburgh. Plaintiff admits that Wachtel rendered him a bill of $100 for services and that he paid it. It seems quite improbable that Wachtel would render, or plaintiff pay without protest, such a bill for so slight a service. It seems much more probable that Wachtel's services for which he was paid this sum included looking after the matter for the plaintiff. That plaintiff asked Wachtel to perform other services after the price had been obtained, his own testimony discloses. Nor does it seem reasonable or probable to us that defendant Curtis assumed and agreed without compensation that the title should be perfect, that all grantors in the chain of title were of age when they executed the various deeds, that all dower interests were acquired, and that no defects existed in the title. While he had been admitted to the bar, he was not a practicing attorney, and it is undisputed upon this record that the law

business of the bank, including the examination of titles, was turned over to Halstead & Halstead, the bank's attorneys. Plaintiff himself testifies that as early as January, 1909, before he had commenced his operations, Curtis informed him that he had gotten part of the title and had paid out part of the money. So far as is disclosed by this record, no protest was made by him that Curtis was then violating his instructions, no claim was then made that Curtis was not acting in strict accordance with the understanding. This circumstance is in consonance with the claim of Curtis as to what the understanding was, and is out of accord with the claim most earnestly pressed in plaintiff's behalf that Curtis is liable because he did not hold the entire sum of $3,500 until the title was perfected.

Considerable is claimed for the fact that defendant Curtis inserted his own name as grantee in the deeds, the deeds as delivered having left a blank for the name of the grantee to be inserted, and the trial judge seems to have been impressed with this claim. But the testimony clearly establishes that the title was to be taken in the name of Curtis, and he was to hold the lands as security. After the timber had been cut from the land and as plaintiff sold it, defendant executed quitclaim deeds of various parcels to plaintiff and the proceeds of such sales were largely applied on the indebtedness. Plaintiff knew from the first that Curtis had taken title in his own name, and, so far as we are able to discover from this record, never questioned the right of Curtis to take such title in his own name until this litigation arose.

Two opinions were filed by the trial judge. The record does not disclose whether this was occasioned by a reargument of the case or not. In the first one he concluded that defendant Curtis was not liable for the defect of title caused by reason of the minority of

Julius Earl French but was liable for other defects. In the second one he concluded that defendant Curtis was liable for the amount paid by plaintiff to obtain the title of Julius Earl French and Molly French together with his expenses, but did not allow for other defects claimed to exist in the title. We are constrained to differ from both of these conclusions. When we weigh and measure the testimony in this record, take into consideration the surrounding circumstances, the reasonableness and probabilities of the claims asserted, as we must do in a chancery case, we feel bound to conclude that the preponderance of the convincing testimony and circumstances are with the defendant. It results from this conclusion that the decree appealed from must be vacated and one here entered dismissing the bill. Defendant will recover costs of both courts.

MOORE, C. J., and STEERE, BROOKE, STONE, CLARK, BIRD, and SHARPE, JJ., concurred.